BADGER LUMBER COMPANY, a Corporation, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.—89 S. W. (2d) 954.

Division One, January 11, 1936.*

*NOTE: Opinion filed at May Term, 1935, July 9, 1935; motion for rehearing filed; motion overruled December 18, 1935; motion to transfer to Court en Banc filed; motion overruled at the September Term, January 11, 1936.

350

*Joseph W. Jamison, Henry S. Conrad, L. E. Durham, Hale Houts, I. M. Lee* and *Wright Conrad* for appellant.

*Langworthy, Spencer & Terrell* for respondent.

PER CURIAM:—This cause is in ejectment to recover the pos-. session of a strip of land seventeen feet in width and 1092 feet in

length in Kansas City, Missouri, and between Thirty-seventh Street on the north and Thirty-ninth Street on the south, and near 6800 East. Cause was tried to a jury. Plaintiff obtained judgement for possession, but nothing for damages or rents and profits. Motion for a new trial was overruled and defendant appealed.

Petition is in conventional form. The answer admits possession; denies that plaintiff was entitled to possession and pleads adverse possession for more than forty years. Reply denies new matter generally.

Defendant assigns error on the refusal of its peremptory request for a directed verdict at the close of the whole case and on Instruction No. 2 given for plaintiff.

Before proceeding to the merits it is necessary to dispose of a motion filed here to stay this cause pending the final disposition of defendant in bankruptcy proceedings in the United States District Court, Eastern District of Missouri. Section 11 (a) of the Bankruptcy Act (Sec. 29 (a), 11 U. S. C. A.) provides: "A suit which is founded upon a claim from which a discharge would be a release, and which is pending against a person at the time of the filing of a petition against him, shall be stayed until after an adjudication or the dismissal of the petition; if such person is adjudged a bankrupt, such action may be further stayed until twelve months after the date of such adjudication, or, if within that time such person applies for a discharge, then until the question of such discharge is determined."

Section 77 (L) of the Act of March 3, 1933, Subdivision L, Section 205, 11 U. S. C. A., amending the Bankruptcy Act provides: "In addition to the provisions of Section 11 of this Act for the staying of pending suits against the debtor, such suits shall be further stayed until after final decree the judge may, upon notice and for cause shown, enjoin or stay the commencement or continuance of any judicial proceeding to enforce any lien upon the estate until after final decree."

When the bankruptcy petition was filed by defendant in the United States District Court, Eastern District of Missouri, under the amendment of March 3, 1933, the instant cause was pending, and on that petition the court, so far as pertinent here, ordered: "That all suits pending against the debtor founded upon claims from which a discharge would be a release . . . be, and they hereby are, stayed until after final decree herein, and that the debtor, its officers, directors, agents, attorneys, employees, and all persons who act by virtue of or under it, and all other persons, firms and corporations whatsoever and wheresoever situated, located or domiciled (other than said receivers, their agents and employees) are hereby restrained and enjoined from interfering with, attaching, levying upon, or in

any manner whatsoever disturbing any portion of the assets, goods, monies, railroads, properties and premises of the debtor.''

Plaintiff below, respondent here, resists defendant's motion to stay. It will be noted that Section 11 of the Bankruptcy Act provides that a pending suit ''founded upon a claim from which a discharge would be a release'' shall be stayed. The cause at bar is in ejectment and there was no finding and judgment for damages or for monthly rents and profits. In the following instances, stays were refused: A suit to set aside a fraudulent conveyance, In re United Wireless Tel. Co., 192 Fed. 238; the attachment of a fund claimed by the attaching plaintiff, Tennessee Producer Marble Co. v. Grant, 135 Fed. 322; the execution of deeds pursuant to a decree in specific performance relating to lands, In re Chab, 8 Fed. Supp. 195; the enforcement of judgment in forcible entry and detainer, In re Smith, 7 Fed. Supp. 863. In 7 Remington on Bankruptcy (4 Ed.), section 3443, it is stated: ''In actions to try the title to property, or to determine the validity of liens on property, or interests therein, where no recovery of a debt is sought, the defendant may not interpose his discharge in bankruptcy—discharge bars debts, not ownership of property, whether such ownership be absolute, conditional or by way of lien, whether it be ownership of the whole or merely partial ownership.''

Peters v. Bowers (Colo.), 158 Pac. 1101, was in ejectment. Headnote 1 states the holding of the Supreme Court of Colorado so far as pertinent to the question here, and this note is as follows: ''One claiming title to and right of possession of land also claimed by trustee in bankruptcy as part of the estate is entitled to a trial by independent suit, at law or in equity, as distinguished from a summary proceeding in bankruptcy.''

Defendant cites no authority to support its motion to stay and we find none. We see nothing in the order of the United States District Court which would justify staying the cause here. Manifestly there is no merit in defendant's motion to stay, and it is overruled.

On the merits: It is conceded that plaintiff had record title. Plaintiff's evidence shows that it acquired by deed the strip of land in 1903, and has since that time paid all taxes assessed against it. This, plaintiff says, made a prima facie case for the jury. On the other hand defendant says that plaintiff's own evidence shows that defendant had been in open, adverse possession for more than ten years, and that such being the case, the peremptory direction should have been given. The tract of land in question lies west of defendant's main track and extends, we may say, somewhat from the northeast to the southwest or *vice versa*. Plaintiff's evidence was that the Missouri Pacific right of way joins defendant's right of way on the east; that it is thirty-three feet from the center of defendant's track to the west line of the Missouri Pacific right of way, and thirty-

three feet from the center of defendant's track to the east line of the strip in question. Plaintiff in January, 1926, had the strip surveyed and at that time there was an iron marker in the ground at both the north and south ends of the strip, and these markers were thirty-three feet west from the center of defendant's track. A line drawn between these markers would be the east line of the strip; and at the time of the survey there were telegraph poles along the line between the two markers. On cross-examination of plaintiff's witness, Arthur Hands, who made the survey and who testified as to the markers and the telegraph poles, it was disclosed that at the time of the survey, there was a wire fence along the west side of the strip, which would place the fence fifty feet from the center of defendant's track.

Allen Gibbon, plaintiff's witness, testified that he was manager of Leeds Lumber Company, a subsidiary of plaintiff; that the Leeds Lumber Company is on land of plaintiff near the strip in question; that he had been "out there" eight years. This cause was commenced August 15, 1927, and was tried April 28, 1930. Gibbon testified that during the eight years he had been there he had observed the strip; that the first time he saw the land in question, the defendant had at Thirty-seventh Street, "a small space with cinders there for the purpose of discharging of the passengers that might alight from the train and stop at Thirty-seventh Street;" that the cinder space was "25 feet by 50 or 75 feet;" that there were no further cinders along the right of way, except what was on the roadbed; that "the rest of the ground was marshy ground," growing up in weeds; that the strip was not enclosed at the ends; that he saw the iron markers "soon after I took charge of the yard;" that the markers were there the first time he saw the strip of land; that plaintiff claimed the strip during the eight years; that he relied on the markers as designating the line between defendant's right of way and plaintiff's land. On cross-examination Gibbon said that there was "a part of a fence, not a complete fence" along the west line of the strip; "Q. Some of these posts were about ready to fall down, were they? A. Some had fallen down. Q. Wouldn't you state that would indicate they had been there a long while? A. No, sir. Q. Your answer, then, would be they might have been in a bad state of preservation when they were erected? A. You could put out certain types, and they will rot in a year or two. Q. How was the wire—in pretty bad condition? A. Part rusty and part reasonably new. Q. There were some posts that were reasonably new, were there not, which indicated it had been repaired along, and new posts put in? A. Yes, our company put some in, to keep the horses in the pasture out there, to keep them in. Q. How long was that after you went out there? A. I don't recall the time of that. Q. In other words, replaced

some of the posts in this fence 50 feet from the track, west, is that right? A. Yes, sir.''

The deposition of John D. Warren, deceased at the time of the trial, was read in evidence by plaintiff. Warren testified that he was vice president of plaintiff for some ten years; that he had been connected with plaintiff for twenty-six years; that within the ''last year'' some posts were set along the north end of the strip; that except for the posts, the right of way had never been closed at either end. On cross-examination Warren stated that the fence had been along the west line of the strip in question since plaintiff got deed covering it in 1903.

William R. Rennick, for defendant, testified that he lived at 6800 East Thirty-seventh Street; that he was sixty-five years old; that he lived about a block east of defendant's track on the west side of which is the strip in question; that he had lived there forty-two years; that he had a store on the west side of the track; that for twenty-seven years he passed over the track as often as six times each day; that there had been a fence about fifty feet west of defendant's track for about forty-one years, since the railroad was built; that defendant's section men sometimes mowed the area between the track and the fence and between Thirty-seventh and Thirty-ninth streets; that the fence was repaired from time to time, but that he did not know who repaired it. Grover F. Rennick, son of William, and forty-two years old, testified to the effect that there had been a fence along the west line of the strip in question for thirty years; that defendant's section men, about once each year, cleaned up the strip, mowed the weeds, etc. Jesse O. Burns, defendant's section foreman for ten years, and forty-five years old, testified that his father before him was section foreman, and that he, the witness, had been acquainted with the strip in question since 1902; that a fence was along the west line of the strip to his knowledge since 1902; that he, with his father and other section men, from time to time, through the years, repaired this fence; that they, over the same period, mowed and looked after the entire area between the track and the fence. He also testified that he and defendant's roadmaster, Neil Gamble, placed the iron markers above mentioned, at the north and south ends of the strip in question; that they placed like markers on the east side of the track along the right of way line between defendant and the Missouri Pacific, which line was as stated, thirty-three feet east of the center of defendant's main track; that these markers were placed, he thought in 1925; that there was no fence on the right of way line between defendant and the Missouri Pacific.

Neil Gamble, roadmaster of defendant at Kansas City, from July, 1924, to August, 1926, testified that he directed Burns, the section foreman, to place the iron markers on the east side of the strip in

356

question; that the markers were "four-foot long iron rails," and were placed about one foot in the ground with three feet above ground; that they were placed about October, 1925; that the purpose of placing the markers "was to designate the right of way, if I could, where I could verify the widths; on the east side was the Missouri Pacific which paralleled our track at these points; the right of way (of defendant) was 33 feet and no fence indication. . . . I assumed, having no maps or anything else, that the right of way was about 66 feet on my own assumption. I tried to verify this through our local office, Mr. Flanagan's office; we had no maps in that station, and I left them, these two iron rails in the ground at approximately 33 feet, not on the street line or in the property line. . . . I gave instructions (to Burns) to maintain the right of way from the track to the fence, as he had done prior, unless he received instructions, and in writing, from the local superintendent or me."

J. M. Flanagan, defendant's superintendent from about 1911 to 1929, testified that he did not direct roadmaster Gamble "to plant any markers out there inside of the right of way fence;" that he had "always considered the right of way fence as our right of way line;" that the fence was about 50 feet west of the center line of the Frisco track." This witness testified on cross-examination: "Q. As superintendent out there for the Frisco, was it your intention to take any property that didn't belong to you, for your company? A. Take property? Q. Yes. A. No, sir. Q. You didn't intend to claim any property that didn't belong to the company, did you? A. Why should I? Q. You didn't? A. No." After testifying as appears immediately, supra, the witness stated: "I claim what I understand to be our right of way, which is the right of way fence."

S. B. Musgrave, connected with defendant's telegraph department, testified that the telegraph poles along the east line of the strip in question were moved west nearly to the fence, and that the poles were moved because defendant put in a team track on the west side of its main track between Thirty-seventh and Thirty-ninth streets, and that these poles interfered with trucks getting to this track.

Defendant, to support its contention that its peremptory request for a directed verdict should have been given, principally relies upon Milligan v. Fritts, 226 Mo. 189, 125 S. W. 1101; Bryan v. Millar, 299 Mo. 180, 252 S. W. 366. In the Milligan case, plaintiff did not question the fact that defendant had been in adverse possession of the strip of land in question for a period of more than ten years and exercising acts of ownership over it, but the contention was that during all the time of defendant's possession, his claim of ownership was conditioned, that is, he claimed the strip in question subject to the ascertainment of the true line, whenever that line should be ascertained. In that case, plaintiff prevailed at the trial below and on appeal, the judgment was reversed and the cause re-

manded with a direction to enter judgment for the defendant. If, in the instant case, it were *admitted* that defendant had been in adverse possession for the required period, exercising, without condition all rights of ownership, then defendant's peremptory request should have been given, but plaintiff did not so *admit*. In the Bryan case, plaintiff recovered below and the judgment was reversed outright. It is stated in the Bryan case: ''The case is unusual in that respondent went upon the stand and testified in the case to the sufficient duration, notoriety and continuity of appellant John A. Millar's possession, and also testified that Millar, for more than ten years claimed in good faith to own the land in suit and that he, respondent, had known all these things for more than ten years. He omitted no element of a sound defense to his action. This was a judicial admission of the facts to which he testified.''

In the case at bar, plaintiff did not admit that defendant had been in adverse possession for the required length of time. It does appear from plaintiff's witnesses on cross-examination that plaintiff had knowledge of the existence of the fence, and witness Warren, plaintiff's vice president, stated that the fence had been there since 1903, but we do not think that such evidence, brought out on cross-examination should be construed as a judicial admission that defendant had been in adverse possession for the length of time required. Plaintiff showed record title, which defendant concedes. Plaintiff acquired title by deed November 21, 1903, and has since that time, paid all taxes assessed. Such made a prima facie case for plaintiff. [Quisenberry v. Stewart (Mo.), 219 S. W. 625; Eatherton v. Henderson (Mo.), 59 S. W. (2d) 623.] Defendant's evidence tended strongly to show and we might say that defendant's evidence is uncontradicted, that it has been in possession of the strip of land in controversy for forty years and during this period, has exercised rights of ownership, but all the evidence of adverse possession rests in parol and such being so, it was the province of the jury to believe it or not believe it, and we have no right nor disposition to invade this province of the jury. [Bryan v. Millar, supra; Quisenberry v. Stewart (Mo.), 219 S. W. 625, l. c. 626, and cases there cited.] Defendant's peremptory request for a directed verdict was properly refused.

■ Defendant challenges plaintiff's Instruction No. 2. This instruction is as follows: ''The court instructs the jury that the plaintiff, Badger Lumber Company, is the owner of the record title to the strip of ground in controversy, to-wit: (Here follows description), and that the law presumes that the occupancy of the strip by the defendant St. Louis-San Francisco Railway Company, and those under whom it claims, was by consent and subject to said ownership of the Badger Lumber Company and not adverse; and if you find from the evidence that defendant was in possession thereof on

or about the 18th day of April, 1927, if you so find, then your verdict must be for the plaintiff, unless the defendant shows by a preponderance of the credible testimony that for ten years or more prior to August 15, 1927, the time of the institution of this suit, the defendant and those under whom it claims the said strip of land, have knowingly—(1) had exclusive possession of said strip, that is, have excluded entirely the plaintiff and those under whom it claims from use of and possession of said strip; (2) held and occupied said strip under claim of right, that is, must have pretended or asserted that they had some legal authority to hold it; (3) held adverse and hostile possession, that is, they must have intended to exclude the true owner knowing that there was a true owner; (4) had continuous possession, that is, uninterrupted by plaintiff or any one else during said period; and (5) had open and notorious possession of said strip, that is, they must have had visible and unequivocal control of the same as their own property.''

This instruction was approved in Fiorella v. Jones (Mo.), 259 S. W. 782, but learned counsel for defendant vigorously argue that there is such distinction on the facts between the Fiorella and the instant case as to make the instruction inapplicable to the present facts. Defendant contends that under the facts it was error to instruct that the law presumed that the occupancy by defendant was by consent of plaintiff and was not adverse. To support the instruction plaintiff relies upon the Fiorella case, supra, and Mowry v. Norman, 204 Mo. 173, l. c. 191, 103 S. W. 19. In the Fiorella case the particular feature of the instruction now under consideration was not ruled, and we find nothing in the Mowry case or any other to support that part of Instruction No. 2 which tells the jury that defendant's possession was presumed not to be adverse. The doctrine of adverse possession is based on the presumed acquiescence of the landowner. 2 Corpus Juris, 76, ''for the law presumes, until the contrary appears, that those in possession are rightfully so.'' [Fugate v. Pierce, 49 Mo. 441, l. c. 449.] But the presumption of acquiescence to the possession on the part of the landowner does not imply, necessarily, that the possession of the defendant is not adverse. Acquiescence cannot be presumed unless the owner has or may be presumed to have notice of the possession, hence the importance of the openness and notoriety of the possession. [2 C. J. 76.] When the evidence tends to show that the possession has all the qualities of an adverse holding, the law presumes that such possession is adverse, absent evidence to the contrary. [Corrigan v. Early (Mo.), 183 S. W. 574; Lemmons v. McKinney, 162 Mo. 525, l. c. 531, 63 S. W. 92; Hedges v. Pollard, 149 Mo. 216, l. c. 225, 50 S. W. 889.] Defendant in the case at bar claimed the land to what is called the right of way fence, and this fence had been there for at least forty years as appears from the uncontradicted evidence. Also defendant,

according to its evidence, had exercised such rights of ownership over the land in question as, if believed by a jury, to make the possession adverse in character. It is our conclusion that it was error to direct in Instruction No. 2 that the law presumes that defendant's possession was not adverse. Our ruling here in no way conflicts with the ruling in the Fiorella case, because the feature of plaintiff's Instruction No. 2, here ruled was not considered in that case.

The Fiorella case, supra, rules with good reason, we think, the correctness of the remainder of plaintiff's Instruction No. 2, and it is not necessary to repeat here. For the error in Instruction No. 2, on the point above considered, the judgment should be reversed and the cause remanded, and it is so ordered. *Coles, J.*, not sitting.

### ON MOTION FOR REHEARING.

PER CURIAM:—In the motion able counsel insist that we are out of line in ruling that it was error to incorporate in Instruction No. 2 as to what the law presumes. ▮ Adverse possession means a possession in opposition to the true title and real owner, and such possession implies that it commenced in wrong by ouster or disseizin and is maintained against right, and the law presumes "that every possession is rightful and consistent with, not in opposition or adverse to, title and ownership." [Hunnewell v. Burchett, 152 Mo. 611, l. c. 614, 54 S. W. 487.] Therefore, a party who relies upon adverse possession, in order to rebut this presumption, must prove his possession to be adverse; he must show "the actual knowledge of the real owner that he claims in opposition to" or, "he must show such an occupancy and user, so open and notorious and inconsistent with, as well as injurious to, the rights of the true owner, that the law will authorize, from such facts, the presumption of such knowledge by the true owner." [Hunnewell v. Burchett, supra. See, also, Missouri Lumber & Mining Company v. Jewell, 200 Mo. 707, l. c. 716, 98 S. W. 578; Heckescher v. Cooper, 203 Mo. 278, l. c. 293, 101 S. W. 658; McCune v. Goodwillie, 204 Mo. 306, l. c. 339, 102 S. W. 997; Burnside v. Doolittle, 324 Mo. 722, l. c. 731, 24 S. W. (2d) 1011; 2 C. J., sec. 587, p. 264.] As held in the opinion, following Corrigan v. Early (Mo.), 183 S. W. 574, when the evidence tends to show that the possession has all the qualities of an adverse holding, the law presumes that such possession is adverse, absent evidence to the contrary. But these presumptions, when there is evidence to show the facts, have no place in an instruction.

The motion for rehearing should be overruled, and it is so ordered.